Michael Connett (SBN 300314)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone 888-747-4529
*mconnett@sirillp.com*

Tyler J. Bean (*pro hac vice* to be filed)
Albert J. Asciutto (*pro hac vice* to be filed)
Alexander J. Garcia (*pro hac vice* to be filed)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone 212-532-1091
Facsimile 646-417-5967
*tbean@sirillp.com*
*aasciutto@sirillp.com*
*agarcia@sirillp.com*

*Counsel for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISON**

| | |
|---|---|
| **ELIZABETH RORKE-GIORGI** and **LORENA MORAZAN,** individually and on behalf of all others similarly situated,<br><br>Plaintiff(s),<br><br>v.<br><br>**ULTA BEAUTY, INC.,** a Delaware Corporation.<br><br>Defendant. | Case No. 2:26-at-1564<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE, AND EQUITABLE RELIEF FOR:**<br><br>**1. VIOLATIONS OF CAL. CIV. CODE 1798.90.5**<br>**2. INVASION OF PRIVACY UNDER CAL. CONST. ART. 1, 1**<br>**3. INVASION OF PRIVACY**<br>**4. UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Elizabeth Rorke-Giorgi and Lorena Morazan (hereinafter, “Plaintiffs”) individually and on behalf of all similarly situated persons, allege the following against Defendant Ulta Beauty, Inc. (hereinafter, “Defendant”), based upon personal knowledge with

respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## INTRODUCTION

1. In 1887, the Northern District of California recognized that:

> Of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, but exemption of his private affairs, books, and papers, from the inspection and scrutiny of others. Without the enjoyment of this right, all others would lose half their value.[1]

2. Nearly 150 years later, Americans still agree,[2] placing great value on their right to privacy, including their right to travel and associate with others without being surveilled. Unfortunately, in the modern era, this right is increasingly threatened by the irresponsible deployment of new technologies.

3. Flock Group, Inc. ("Flock") is a technology company that specializes in automatic license plate recognition systems, commonly referred to as Automatic License Plate Readers ("ALPRs"). ALPRs are advanced camera systems that can automatically detect and record an individual's "Vehicle Tracking Data," and then aggregate and use that information to track an individual's movements. The term "Vehicle Tracking Data" as used herein means license plate numbers, vehicle characteristics (including any and all data used by Defendant and/or Flock to identify a given vehicle), time-stamped records, and geographic location data reflecting a vehicle's location and movements through areas, along with any other information monitored, captured, collected, and/or aggregated by Flock's ALPRs and ALPR systems.

4. Flock's customers—including homeowners' associations, businesses, schools, law

---

[1] *In re Pacific Ry. Commission*, 32 F. 241, 250 (N.D. Cal. 1887).

[2] *See, e.g., YouGov Mass Surveillance Polling*, DPEF (Dec. 14, 2023), demandprogresseducationfund.org/new-polling-as-mass-surveillance-debate-reaches-final-stages-in-congress-americans-demonstrate-overwhelming-support-for-increased-privacy-protections (last accessed Aug. 20, 2025) (78% of Americans think Congress should strengthen geolocation privacy protections); Mary Madden and Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance,* PEW (May 20, 2015), https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/ (last accessed Aug. 20, 2025) (88% of Americans state not being watched without permission "important").

enforcement organizations, and anyone else willing to pay the approximately $2,500 annual fee for access to its enormous database of personal information—can install Flock's ALPRs on their property or around their community. Once installed, the ALPRs identify and create a detailed record of every vehicle that enters its view. Unlike a person at an intersection, these cameras never blink, they never sleep, and they see and remember everything. Every passing car is captured, and its license plate and other features are analyzed using proprietary machine learning programs.

5. More troubling is the fact that Flock's customers, like Defendant, who install the cameras on their properties are not the only ones that have access to the data collected by the ALPRs: When Flock's customers provide Flock with access to the recordings created by the customer's ALPRs, Flock then aggregates this data with information collected from thousands of other Flock ALPRs to create a centralized, highly detailed, searchable record of each driver's movements. Flock then grants its customers access to this vast surveillance database (referred to herein as the "Flock Safety Network" or "Flock Safety").[3] As a result, anyone with access to the Flock Safety Network can track the movements of anyone traveling within the reach of Flock's national camera network.

6. The scope of this mass surveillance is truly terrifying. Currently, there are ***at least 80,000*** Flock ALPRs operating in 49 states.[4] Through those ALPRs, Flock captures individuals' Vehicle Tracking Data through a staggering ***20-billion*** vehicle scans every single month,[5] generating an immense database of individuals' movements. All of this is only possible through Flock customers' installation of its surveillance cameras on their properties.

---

[3] *National LPR Network*, FLOCK SAFETY, https://www.flocksafety.com/products/national-lpr-network (last accessed March 6, 2026) (detailed Flock's nationwide shared data network); *Police cameras track billions of license plates per month,* NBC NEWS, https://www.nbcnews.com/tech/tech-news/flock-police-cameras-scan-billions-month-sparking-protests-rcna230037 (last accessed March 6, 2026) (highlighting Flock's "live national database.").

[4] *Flock Gives Law Enforcement All Over The Country Access to Your Location*, ACLU MASSACHUSETTS, https://data.aclum.org/2025/10/07/flock-gives-law-enforcement-all-over-the-country-access-to-your-location/ (last accessed March 10, 2026) (detailed Flock's ALPR surveillance network); *National LPR Network*, FLOCK SAFETY, https://www.flocksafety.com/products/national-lpr-network (last accessed March 6, 2026) (noting Flock's network operates across 49 states).

[5] *Police cameras track billions of license plates per month,* NBC NEWS, https://www.nbcnews.com/tech/tech-news/flock-police-cameras-scan-billions-month-sparking-protests-rcna230037 (last accessed March 6, 2026).

7. The California Legislature was moved by the prevalence and scope of this violation of privacy and passed the California ALPR Law, Cal. Civ. Code § 1798.90.5, *et seq.* (the "ALPR Law"), which regulates the use of ALPRs by public and private entities. Among other things, the California Legislature recognized that, at a minimum, the public has a right to know that their Vehicle Tracking Data is being recorded and aggregated, and how that data will be used. Therefore, the ALPR Law requires that every "end-user" of an ALPR (i.e., a person who uses or access an ALPR system, such as Flock customers, like Defendant) make publicly available, and post conspicuously on its website, very specific ALPR policy and usage information that meets the minimum requirements of the law.

8. Defendant Ulta Beauty, Inc. is one of the largest specialty beauty retailers in the United States, offering cosmetics, fragrance, skin care, hair care products, and salon services through its retail stores and online operations.[6] Defendant owns and operates more than 1,500 retail properties across the United States, including approximately 185 locations here in California.[7]

9. Defendant installed Flock's ALPRs across many, if not all, of its properties in California, resulting in Plaintiffs and Class Members being tracked by Flock's mass surveillance network. However, Defendant failed to properly and timely inform Plaintiffs and Class Members that their Vehicle Tracking Data was being captured, time-stamped, and recorded, nor that the resulting data being aggregated enabled the long-term tracking of Plaintiffs and Class Members' individual movements.

10. Defendant's use of the Flock ALPRs is not just an invasion of privacy, but also a violation of the ALPR Law, in that Defendant failed to publicly post the required policy and usage information as required by the statute.

11. As a result of Defendant's misconduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) emotional distress and heightened concerns

---

[6] *About Ulta Beauty*, ULTA BEAUTY, https://www.ulta.com/company/about-us (last accessed Sept. 8, 2026) (listing Defendant's industry presence).

[7] *Ulta Beauty Store Directory*, ULTA BEAUTY, https://www.ulta.com/stores/directory#CA (last accessed Sept. 8, 2026) (listing Defendant's locations).

related to the surreptitious surveillance of their movements by unknown third parties; and (iii) statutory damages.

12. Therefore, Plaintiffs seek, on behalf of themselves and a Class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: violations of the California ALPR Law, Cal. Civ. Code § 1798.90.5, *et seq.*; Invasion of Privacy under California's Constitution, Cal. Const. Art. 1, § 1; Common Law Invasion of Privacy; and Common Law Unjust Enrichment.

## PARTIES

### A. PLAINTIFFS

***Plaintiff Elizabeth Rorke-Giorgi***

13. Plaintiff Elizabeth Rorke-Giorgi (hereinafter, "Plaintiff Rorke-Giorgi") is a citizen of the State of California residing in Solano County and brings this action both in an individual capacity, and on behalf of all others similarly situated.

14. Plaintiff Rorke-Giorgi has visited Defendant's Ulta Vallejo retail store located at 147 Plaza Drive, Vallejo, CA 94591 on several occasions to do personal shopping. For example, on August 15, 2026, Plaintiff Rorke-Giorgi drove her personal vehicle to Defendant's Ulta Vallejo location, parked her car in Defendant's parking lot, and entered the Ulta Vallejo retail business to complete her personal shopping.

15. Unbeknownst to Plaintiff Rorke-Giorgi, Defendant had installed Flock ALPRs on its premises which recorded Plaintiff Rorke-Giorgi and her Vehicle Tracking Data, and transmitted that data, including pictures of her vehicle, other automatically-generated information relating to her vehicle, the identities of her associates, and her time-stamped location, to Flock, where it was then aggregated and catalogued in Flock's voluminous vehicle tracking records.

16. Defendant failed to properly and timely inform Plaintiff Rorke-Giorgi, through the public posting on its website of a usage and privacy policy as required under California's ALPR Law, that when she visited Defendant's shopping center, Defendant recorded and tracked Plaintiff Rorke-

Giorgi's location, movements, and Vehicle Tracking Data and transmitted that information to Flock for the unauthorized and illegal purposes set forth herein.

17. Plaintiff Rorke-Giorgi was not aware that she was being tracked, and never authorized Defendant to disclose any information pertaining to her person, including ALPR-collected information subject to the California ALPR Law, to Flock or any other unauthorized third-party.

18. Plaintiff Rorke-Giorgi worries about the proliferation of Flock ALPRs in California. The installation and operation of the Flock ALPRs in California, all connected to Flock's nationwide database, have given her a great deal of anxiety. Plaintiff Rorke-Giorgi worries about her privacy and personal security, and she worries about how governmental and private individuals with access to the Flock Safety Network might use or misuse the records of her movements. Further, Plaintiff Rorke-Giorgi worries that malicious third-party hackers might one day gain access to the Flock Safety Network and misuse such data.

19. Plaintiff Rorke-Giorgi, like most people, tries to maintain a degree of privacy in her life. But Defendant's installation and operation of the Flock ALPRs have invaded her privacy by exposing a record of her movements throughout Solano County to every Flock ALPR end-user and the persons to whom they have granted access to the information captured and processed by Flock. And worse, Defendant engaged in such violations without publicly notifying Plaintiff and Class Members of the same.

20. Plaintiff Rorke-Giorgi has no control over how Flock, or anyone else who has authorized or unauthorized access to the Flock Safety Network, uses the record of her movements and/or her Vehicle Tracking Data. Plaintiff Rorke-Giorgi has no say in when, or even if, Flock's records of Plaintiff Rorke-Giorgi's personal information and movements will be deleted. Additionally, if someone misuses Plaintiff Rorke-Giorgi's information, or if Flock experiences a data breach exposing Plaintiff Rorke-Giorgi's information, Plaintiff Rorke-Giorgi may never know unless the affected user or Flock decides to tell her.

21. On information and belief, Defendant used the Flock ALPRs to capture the whole of Plaintiff Rorke-Giorgi's movements at, in, and around Defendant's Ulta Vallejo location, and will

continue to do so until the expiration or termination of each Flock Safety user's access to this information. Further, on information and belief, Defendant used the Flock ALPRs to record, transmit, and share Plaintiff Rorke-Giorgi's personal movement and Vehicle Tracking Data with any individual or entity who has access to the Flock Safety Network.

***Plaintiff Lorena Morazan***

22. Plaintiff Lorena Morazan (hereinafter, "Plaintiff Morazan") is a citizen of the State of California residing in Solano County and brings this action both in an individual capacity, and on behalf of all others similarly situated.

23. Plaintiff Morazan has visited Defendant's Ulta Vallejo retail store located at 147 Plaza Drive, Vallejo, CA 94591 on several occasions to do personal shopping. For example, on May 15, 2026, Plaintiff Morazan drove her personal vehicle to Defendant's Ulta Vallejo location, parked her car in Defendant's parking lot, and entered the Ulta Vallejo retail business to complete her personal shopping.

24. Unbeknownst to Plaintiff Morazan, Defendant had installed Flock ALPRs on its premises which recorded Plaintiff Morazan and her Vehicle Tracking Data, and transmitted that data, including pictures of her vehicle, other automatically-generated information relating to her vehicle, the identities of her associates, and her time-stamped location, to Flock, where it was then aggregated and catalogued in Flock's voluminous vehicle tracking records.

25. Defendant failed to properly and timely inform Plaintiff Morazan, through the public posting on its website of a usage and privacy policy as required under California's ALPR Law, that when she visited Defendant's shopping center, Defendant recorded and tracked Plaintiff Morazan's location, movements, and Vehicle Tracking Data and transmitted that information to Flock for the unauthorized and illegal purposes set forth herein.

26. Plaintiff Morazan was not aware that she was being tracked, and never authorized Defendant to disclose any information pertaining to her person, including ALPR-collected information subject to the California ALPR Law, to Flock or any other unauthorized third-party.

27. Plaintiff Morazan worries about the proliferation of Flock ALPRs in California. The installation and operation of the Flock ALPRs in California, all connected to Flock's nationwide database, have given her a great deal of anxiety. Plaintiff Morazan worries about her privacy and personal security, and she worries about how governmental and private individuals with access to the Flock Safety Network might use or misuse the records of her movements. Further, Plaintiff Morazan worries that malicious third-party hackers might one day gain access to the Flock Safety Network and misuse such data.

28. Plaintiff Morazan, like most people, tries to maintain a degree of privacy in her life. But Defendant's installation and operation of the Flock ALPRs have invaded her privacy by exposing a record of her movements throughout Solano County to every Flock ALPR end-user and the persons to whom they have granted access to the information captured and processed by Flock. And worse, Defendant engaged in such violations without publicly notifying Plaintiff and Class Members of the same.

29. Plaintiff Morazan has no control over how Flock, or anyone else who has authorized or unauthorized access to the Flock Safety Network, uses the record of her movements and/or her Vehicle Tracking Data. Plaintiff Morazan has no say in when, or even if, Flock's records of Plaintiff Morazan's personal information and movements will be deleted. Additionally, if someone misuses Plaintiff Morazan's information, or if Flock experiences a data breach exposing Plaintiff Morazan's information, Plaintiff Morazan may never know unless the affected user or Flock decides to tell her.

30. On information and belief, Defendant used the Flock ALPRs to capture the whole of Plaintiff Morazan's movements at, in, and around Defendant's Ulta Vallejo location, and will continue to do so until the expiration or termination of each Flock Safety user's access to this information. Further, on information and belief, Defendant used the Flock ALPRs to record, transmit, and share Plaintiff Morazan's personal movement and Vehicle Tracking Data with any individual or entity who has access to the Flock Safety Network.

**B. DEFENDANT**

31. Defendant Ulta Beauty, Inc. is a corporation formed under the laws of Delaware with its principal place of business at 1000 Remington Blvd., Suite 120, Bolingbrook, IL 60440.

## JURISDICTION AND VENUE

32. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Minimal diversity is established as at least one member of the proposed class is a citizen of a state different from at least one Defendant.

33. This Court has general personal jurisdiction over Defendant because Defendant conducts substantial business in California, including owning, operating, and managing 185 Ulta retail locations throughout the State. Plaintiffs' and Class Members' claims arise out of and relate to Defendant's California-based activities, including its operation of Ulta properties within this State.

34. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## STATEMENT OF FACTS

### I. LEGISLATIVE HISTORY OF THE ALPR LAW

35. In 2015, California enacted the ALPR Law, Cal. Civ. Code §§ 1798.90.5 *et seq*., to address the increasing use of ALPR systems and the privacy risks associated with the aggregation and storage of Vehicle Tracking Data. The Legislature enacted the statute against the backdrop of rapidly expanding surveillance technology capable of collecting and aggregating large volumes of location-based information about individuals.

36. The legislative history of the ALPR Law reflects a particular concern with the ability of ALPR technology to compile historical Vehicle Tracking Data, aggregate that information, and to do so without public notice or consent.

37. The Senate Committee on Transportation and Housing, when reviewing the ALPR Law proposal, explained that while license plates themselves are publicly visible, ALPR technology enables far more extensive monitoring because of its ability to systematically collect and aggregate Vehicle Tracking Data. The Committee noted that ALPR systems can capture thousands of license plates per minute and compare those plates against databases of vehicles associated with crimes or other alerts.[8]

38. The California Assembly Committee on Privacy and Consumer Protection explained that ALPR systems "have the ability to record vehicles' attendance at locations or events that, although lawful and public, may be considered private."[9] The Committee further noted the potential sensitivity of such information, observing that "mobile LPR units could read and collect the license plate numbers of vehicles parked at addiction counseling meetings, doctors' offices, health clinics, or even staging areas for political protests."[10]

39. Against this backdrop, the Senate Committee on Transportation and Housing emphasized the risks created when ALPR systems compile and store location data over time. The Legislature expressed concern that ALPR technology allows the creation of large databases of Vehicle Tracking Data, enabling the reconstruction of an individual's movements and activities through the aggregation of time-stamped location records. As the Committee explained:

> "Unlike other types of personal information that are covered by existing law, civilians are not always aware when their ALPR data is being collected. One does not even need to be driving to be subject to ALPR technology: A car parked on the side of the road can be scanned by an ALPR system."[11]

---

[8] Senate Committee on Transportation and Housing (April 7, 2015) https://www.leginfo.ca.gov/pub/15-16/bill/sen/sb_0001-0050/sb_34_cfa_20150402_153639_sen_comm.html (last accessed March 5, 2026).

[9] Assembly Committee on Privacy and Consumer Protection – Bill Analysis for SB 34 (July 7, 2015) https://www.leginfo.ca.gov/pub/15-16/bill/sen/sb_0001-0050/sb_34_cfa_20150706_104259_asm_comm.html (last accessed March 5, 2026).

[10] *Id.*

[11] Senate Committee on Transportation and Housing (April 7, 2015) https://www.leginfo.ca.gov/pub/15-16/bill/sen/sb_0001-0050/sb_34_cfa_20150402_153639_sen_comm.html (last accessed March 5, 2026).

40. Given the immense risk of abuse at the expense of individuals' rights to privacy, the Senate committee noted the privacy concerns associated with ALPR technology, explaining:

> "The collection of a license plate number, location, and time stamp over multiple time points can identify not only a person's exact whereabouts but also their pattern of movement."[12]

## II. CALIFORNIA'S ALPR LAW

41. To address these privacy concerns, the California Legislature imposed specific requirements on entities operating or using ALPR systems. As the Legislature stated, the purpose of the ALPR Law is to ensure "minimal privacy protections by requiring the establishment of privacy and usage protection policies for ALPR operators and end-users. This bill does not prevent the authorized sharing of data, but if data is shared, it must be justified and recorded."[13]

42. The ALPR Law defines an "ALPR system" as "a searchable computerized database resulting from the operation of one or more mobile or fixed cameras combined with computer algorithms to read and convert images of registration plates and the characters they contain into computer-readable data." Cal. Civ. Code § 1798.90.5(a).

43. The ALPR Law requires ALPR end-users, defined as "a person that accesses or uses an ALPR system," to draft and adopt written policies governing the collection, use, and sharing of ALPR information. *See* Cal. Civ. Code §§ 1798.90.51(b), 1798.90.53(b).

44. Importantly, the ALPR Law demands ALPR end-users must "implement a usage and privacy policy to ensure that the collection, use, maintenance, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties." Cal. Civ. Code §§ 1798.90.51(b), 1798.90.53(b). To not violate an individual's right to know, the statute commands that ALPR end-users' privacy policies include the following:

(A) The authorized purposes for accessing and using ALPR information;

[12] *Id.*
[13] *Id.*

(B) A description of the job title or other designation of the employees and independent contractors who are authorized to access and use ALPR information, including identifying the training requirements necessary for those authorized employees and independent contractors;

(C) A description of how the ALPR system will be monitored to ensure the security of the information accessed or used, and compliance with all applicable privacy laws and a process for periodic system audits;

(D) The purposes of, process for, and restrictions on, the sale, sharing, or transfer of ALPR information to other persons;

(E) The title of the official custodian, or owner, of the ALPR information responsible for implementing this section;

(F) A description of the reasonable measures that will be used to ensure the accuracy of ALPR information and correct data errors; and

(G) The length of time ALPR information will be retained, and the process the ALPR end-user will utilize to determine if and when to destroy retained ALPR information.[14]

45. End-users of ALPR technology are required not only to create and adhere to these privacy policies, but also to make these policies publicly available on their websites, conspicuously specifying the authorized purposes for which ALPR information may be accessed or used. *Id.*

46. Thus, requiring ALPR end-users to establish and publicly post a policy governing use and maintenance of this data is a primary focus of the ALPR Law. Through these provisions, the Legislature sought to mitigate the privacy risks created by ALPR systems by ensuring transparency, limiting unauthorized access and use, and regulating the collection and aggregation of vehicle location data.

47. These requirements ensure both that ALPR end-users consider and make deliberate decisions on these issues, and that individuals can know when and how their ALPR Vehicle Tracking Data is being collected and used.

[14] CA. Civ. Code § 1798.90.53.

48. Most importantly, the ALPR Law "grants individuals *the right to know* which entities are collecting their ALPR data and how it is being used and maintained. Collecting and maintaining individuals' ALPR information without implementing and making public the statutorily required policy harms these individuals by violating this right to know."[15]

## III. FLOCK SURVEILS AMERICAN COMMUNITIES ON A MASSIVE SCALE

### A. Flock's Automatic License Plate Readers

49. Flock is one of the largest ALPR purveyors in the country, marketing its products to a diverse range of public and private entity clients, including retail stores, hospitals, places of worship, residential HOAs, law enforcement agencies, and many more.[16] On its website, Flock represents that its products are used by over 5,000 law enforcement agencies, over 6,000 communities, and over 1,000 businesses.[17]

50. Flock ALPRs are computer-controlled cameras that automatically capture, identify, and record all vehicles that come into their view.[18] Because Flock ALPRs are solar-powered and able to connect to Flock's computer network through cellular data, they can be mounted almost anywhere, including on building exteriors, signposts, light poles, or even moving vehicles. As Flock advertises, customers can "Deploy [its ALPRs] Anywhere."[19]

51. The primary tool used by Flock ALPRs to identify a given vehicle is Flock's license plate detection software. When a license plate enters the ALPR's field of view, the ALPR automatically captures a photograph of the license plate and transfers it to the Flock Safety Network, where character recognition software automatically converts the image into a license plate number.[20]

---

[15] *Bartholomew v. Parking Concepts, Inc.*, 118 Cal. App. 5th 438, 449 (2026).
[16] *Flock Safety*, FLOCK, https://www.flocksafety.com/ (last accessed Aug, 20, 2025) (listing "Industries" that use Flock's products).
[17] *License Plate Readers*, FLOCK, https://www.flocksafety.com/products/license-plate-readers (last accessed Aug. 20, 2025).
[18] *Id.*
[19] *Id.*
[20] *Id.*

52. Flock also employs additional vehicle identification methods beyond license plate detection. For example, through its *Vehicle Fingerprint* software, Flock ALPRs are also able to register a range of vehicle characteristics such as make, model, color, and even unique features like bumper stickers to further ensure accurate identification of a given vehicle.[21]

53. Flock claims that its ALPRs can accurately capture vehicles traveling at up to 100 miles per hour, at distances of up to 75 feet, regardless of lighting.[22] Consequently, through a combination of precise imaging and powerful, multivariable vehicle identification software, Flock ALPRs are able to identify almost every vehicle that they see.

**B. Flock's Mass Surveillance Apparatus**

54. Private entities like Defendant can lease Flock's ALPRs to track vehicles traveling through or near their premises. After being installed, the Flock ALPRs automatically detect, identify, and create a record of every vehicle that enters their field of view.[23] These records include not only a picture of the vehicle but also a wide range of automatically generated identification information, defined herein as Vehicle Tracking Data, including the vehicle's license plate number, make, model, body, state of registration, the date and time it was recorded, the location of the ALPR, and a list of other records of the same vehicle.[24]

55. Once recorded by the Flock ALPRs, these vehicle records, including the Vehicle Tracking Data, are then added to the Flock Safety Network, which combines records from other Flock ALPRs' continuous recordings, including the vehicles captured by at least 80,000 ALPRs nationwide. Ultimately, this system of compiling license plate and vehicle information data allows Flock to create a continuous record of a vehicle's movement through areas where Flock ALPRs are present.

---

[21] *Id*; *Flock Safety: Eroding Your Privacy & Keeping You Safe with Surveillance*, REDACT (May 15, 2025), https://redact.dev/blog/flock-safety-lpr-privacy-surveillance/ (last accessed Aug. 20, 2025).
[22] Andy East, *Columbus Police Department Got Your Number*, COLUMBUS REPUBLIC (Jan. 23, 2022), at A1.
[23] *Id*.
[24] Reproduced from: Sarah Holder and Fola Akinnibi, *Suburbs of Surveillance*, BLOOMBERG (Aug. 4, 2021), https://www.bloomberg.com/news/features/2021-08-04/surveillance-startup-brings-police-tech-to-neighborhoods (last accessed Aug. 20, 2025).

56. Flock's customers can access this vast surveillance database. Indeed, Flock admits that all of the information collected by its ALPRs is accessible through the Flock Safety Network, stating, *e.g.*, in its marketing to law enforcement that:

> If you know the specific license plate in question, use FlockOS to get a detailed report of the suspect vehicle's history over a given timeframe. Use FlockOS's local and national search network to find the suspect vehicle across state lines, including up to 1 billion monthly plate reads. All this is included, for FREE, for any Flock Safety customer.[25]

57. Moreover, through its *Convoy Analysis* feature, Flock also allows users to identify vehicles that are often seen together. As a result, Flock not only tracks where individuals go, but also who they meet.[26]

58. While Flock customers can opt-out of sharing ALPR information with Flock, individuals do not have that option, and Flock heavily encourages its customers to provide their records, including by conditioning access to other features on granting access to ALPR data. Indeed, customers like Defendants who, upon information and belief, share ALPR information with Flock, are able to benefit from its mass surveillance apparatus. For example, through Flock's *Hot List* feature, Flock customers that share their ALPR information can get alerts when a vehicle on the Federal Bureau of Investigation's National Crime Information Center (NCIC) list is detected in their area, even if it is detected by another Flock customer's ALPR.[27]

59. Thus, Flock customers, like Defendant, make a conscious, self-interested choice to participate in Flock's mass surveillance apparatus in exchange for benefiting from information

---

[25] *See Fast-Growing Company Flock is Building a New AI-Driven Mass-Surveillance System*, ACLU (Mar. 1, 2022), *available online at: https://www.aclu.org/publications/fast-growing-company-flock-building-new-ai-driven-mass-surveillance-system* (last accessed Aug. 20, 2025).

[26] Ben Miller, *Flock Safety Gives Users Expanded Vehicle Location Abilities*, GOVTECH (Sep. 1, 2021), https://www.govtech.com/biz/flock-safety-gives-users-expanded-vehicle-location-abilities (last accessed Aug. 20, 2025).

[27] Chad Marlow and Jay Stanley, *How to Pump the Brakes on Your Police Department's Use of Flock's Mass Surveillance License Plate Readers*, ACLU (Feb. 13, 2023), https://www.aclu.org/news/privacy-technology/how-to-pump-the-brakes-on-your-police-departments-use-of-flocks-mass-surveillance-license-plate-readers (last accessed Aug. 20, 2025).

collected by other members of that apparatus. Accordingly, by posting Flock ALPRs on their property and sharing the information captured by those ALPRs with Flock, Defendants chose to provide a record of *each and every* driver that traveled within the vicinity of the ALPRs for use in a mass surveillance enterprise. In exchange, Defendants benefit through receiving the inherently valuable Vehicle Tracking Data collected by ALPRs on other Flock customers' properties.

### C. Flock's Mass Surveillance is a Privacy Nightmare

60. Flock's mass surveillance operates on a massive scale, made possible only by the thousands of entities like the Defendants that are willing to install Flock's ALPRs on their properties. According to public reporting, there are ***at least 80,000*** active Flock ALPRs surreptitiously tracking Americans across the United States. Through this massive camera network, Flock represents that it collects ***20-billion*** individual records per month.[28]

61. Flock's ALPRs are designed to be relatively small and not visually prominent, nor do they advertise their function, as shown in Figures 1 and 2 below.[29] Thus, absent a publicly posted notice regarding an operator's or end-user's ALPR usage and privacy policy, individuals tracked by Flock's

[28] *National LPR Network*, FLOCK, https://www.flocksafety.com/products/national-lpr-network (last accessed Aug. 20, 2025).

[29] Figure 1: *The Oaklandside*, "What are Flock cameras, and why are they controversial in Oakland?" https://oaklandside.org/2025/11/20/flock-safety-cameras-oakland-license-plate-readers/ (last accessed March 9, 2026). Figure 2: *KPBS News*, "San Diego County police agencies access many private license plate readers with minimal oversight," https://www.kpbs.org/news/public-safety/2025/11/20/san-diego-county-police-agencies-access-many-private-license-plate-readers-with-minimal-oversight (last accessed March 9, 2026).

ALPRs have no way of knowing the function of the devices, nor the extent to which their movements are being tracked.





*Figures 1 & 2: Flock ALPRs*

62. Flock does not provide a public directory of its ALPR locations to aid individuals who may want to avoid its mass surveillance. On the contrary, Flock actively tries to hinder the general public from learning of its widespread tracking through the use of cease-and-desist letters to people who try to catalog the locations of their ALPRs.

63. Additionally, in certain areas it is extremely difficult, if not impossible, to entirely avoid having one's Vehicle Tracking Data captured by a Flock ALPR, even when just driving on public roads and never interacting with a Flock customer. Indeed, Flock's vast network of ALPRs monitor not just

a customer's private property, but also the public roads adjacent to those properties. This means that even if you do not interact with a specific Flock customer, or even enter that customer's property, in some areas private citizens are unable to avoid having their movements tracked and loaded into the Flock Safety Network. This means that, in some places, it is not even theoretically possible for someone to "opt out" of tracking.

64. As would be expected, this massive, surreptitious surveillance of private citizens has led to repeated abuse, for example:

**A.** A police chief and an officer (in different departments) in Kansas used Flock to stalk their ex-romantic partners;[30]

**B.** A Texas sheriff searched 6,809 different Flock camera networks to identify a woman who had an abortion, including unlawfully accessing video records from states in which abortion is protected;[31]

**C.** A U.S. Customs and Border Protection's vendor was hacked and license plate images of thousands of travelers at border crossings became available on the dark web;[32] and

**D.** The U.S. Cybersecurity and Infrastructure Security Agency issued an alert after discovering a "low attack complexity" vulnerability in ALPRs sold by Motorola Solutions, one of the biggest players in the industry.[33]

---

[30] *See* Michel Stavola, *Kansas police chief used Flock license plate cameras 164 times to track ex-girlfriend*, THE WICHITA EAGLE (Aug. 17, 2024), *available online at:* www.kansas.com/news/politics-government/article291059560.html (last accessed Aug. 20, 2025).

[31] *See* Rindala Alajaji*, She Got an Abortion. So A Texas Cop Used 83,000 Cameras to Track Her Down*, ELECTRONIC FRONTIER FOUNDATION (MAY 30, 2025), https://www.eff.org/deeplinks/2025/05/she-got-abortion-so-texas-cop-used-83000-cameras-track-her-down (last accessed Aug. 20, 2025).

[32] *See* Drew Harwell and Geoffrey A. Fowler, *U.S. Customs and Border Protection says photos of travelers were taken in a data breach*, THE WASHINGTON POST (June 10, 2019) www.washingtonpost.com/technology/2019/06/10/us-customs-border-protection-says-photos-travelers-into-out-country-were-recently-taken-data-breach/ (last accessed Aug. 20, 2025).

[33] *See Motorola Solutions Vigilant License Plate Readers*, CISA (June 13, 2024), *available online* at: https://www.cisa.gov/news-events/ics-advisories/icsa-24-165-19 (last accessed Aug. 20, 2025).

65. Yet, despite vigorous criticism from a multitude of reputable organizations,[34] Flock's surveillance apparatus is only growing more invasive.

66. No longer satisfied with meticulously tracking vehicles, Flock has turned its attention toward granular surveillance of individuals with its new *Flock Freeform* tool. As shown in the below screenshot ("Figure 3"),[35] *Flock Freeform* allows users to describe a target individual in natural language and review corresponding results from across Flock's ALPR network of at least 80,000 cameras:




*Figure 3. Demonstration of Flock Freeform tool from Flock website*

67. Thus, if companies like Defendant continue choosing to sacrifice their communities' privacy to gain access to the Flock Safety Network, more and more Americans will find themselves unable to escape perpetual surveillance by private, for-profit companies and those companies' customers.

---

[34] *See*, *e.g.*, Sarah Hamid and Rindala Alajaji, *Flock Safety's Feature Updates Cannot Make Automated License Plate Readers Safe*, ELECTRONIC FRONTIER FOUNDATION (June 27, 2025), https://www.eff.org/deeplinks/2025/06/flock-safetys-feature-updates-cannot-make-automated-license-plate-readers-safe (last accessed Aug. 20, 2025); Jay Stanley, *Fast-Growing Company Flock is Building a New AI-Driven Mass-Surveillance System*, ACLU (March 3, 2022), *available online at*: https://www.aclu.org/wp-content/uploads/publications/flock_1.pdf (last accessed Aug. 20, 2025).

[35] Reproduced from: *Flock Freeform*, FLOCK, https://www.flocksafety.com/products/flock-freeform (last accessed Aug. 20, 2025).

## IV. DEFENDANT TRACKED PLAINTIFFS AND CLASS MEMBERS THROUGH USE OF FLOCK'S ALPR TECHNOLOGY WITHOUT THEIR KNOWLEDGE OR CONSENT

68. Defendant installed Flock's ALPRs across many, if not all, of its Ulta properties. As a result, Plaintiffs and Class Members were tracked by the ALPRs while visiting Defendant's Ulta properties, which transmitted their Vehicle Tracking Data, including pictures of their vehicles, their likeness, other automatically generated information relating to their vehicles, the identities of their associates, and their location to Flock, where it was then catalogued in Flock's voluminous vehicle tracking records across its Flock Safety Network.

69. Defendant failed to publicly provide the statutorily required notice to Plaintiff and Class Members, via its website, that when they visited its shopping centers, or even just drove near its Ulta properties, Defendant would record their Vehicle Tracking Data, including location, images, and individualized vehicle information, and transmit that data to Flock for consolidation with any other Vehicle Tracking Data records pertaining to Plaintiffs and Class Members gathered from at least 80,000 other Flock ALPRs installed across the United States.

70. Upon information and belief, prior to at least July 3, 2026, Defendant's Privacy Policy, which was present on its website during the time period when Plaintiffs and Class Members visited Defendant's Ulta locations, failed to mention ALPRs or its use of such surveillance and tracking mechanisms.[36]

71. Defendant's unauthorized and illegal recording of Plaintiffs' and Class Members' Vehicle Tracking Data, without public notice, includes not only a snapshot of their vehicles, but also a wide range of automatically generated identification information, including the vehicle's license plate number, make, model, body, state of registration, the date and time it was recorded, and a list of other records of the same vehicle.

72. Plaintiffs and Class Members' movements and information were illegally recorded by Defendant, combined with other information gathered across other Flock ALPRs, and then stored in

[36] *Privacy Policy last updated July 2, 2026*, WAYBACK MACHINE, https://web.archive.org/web/20260703002632/https://www.ulta.com/company/privacy (last accessed Sept. 9, 2026).

the Flock Safety Network where each record pertaining to a given individual or vehicle could be related to all others, thus creating a continuous record of Plaintiffs and Class Members' movement through areas where Flock ALPRs are present.

73. As such, each time Plaintiffs and Class Members visited Defendant's Ulta properties since Defendant's installation of Flock ALPRs, Plaintiffs and Class Members were unaware that their Vehicle Tracking Data, including their location, movements, and vehicle information, were being tracked, recorded, and shared by Defendant with unauthorized parties.

74. Plaintiffs and Class Members never authorized Defendant to collect or disclose any information about them, including ALPR-collected information subject to the California ALPR Law.

## V. DEFENDANT WAS ENRICHED BY ITS CONTRIBUTION TO THE MASS SURVEILLANCE OF PLAINTIFFS AND CLASS MEMBERS

75. As explained, *supra*, users of Flock ALPRs receive access to inherently valuable Vehicle Tracking Data from other Flock customers' ALPRs in exchange for sharing their own information to the Flock Safety Network.

76. Upon information and belief, Defendant made a conscious, self-interested choice to participate in Flock's mass surveillance apparatus in exchange for benefiting from information collected by other members of that apparatus.

77. Accordingly, by installing Flock ALPRs on its properties and sharing the information captured by those ALPRs with Flock, Defendant chose to provide a record of *each and every* driver that traveled within the vicinity of the ALPRs for use in Flock's mass surveillance enterprise in exchange for valuable data collected by ALPRs on other Flock customers' properties.

78. In other words, Defendant was enriched in the form of being granted access to the Flock Safety Network database in exchange for allowing Flock to access the records created by the ALPRs installed on its own properties.

## VI. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

79. At all times, Plaintiffs and Class Members had a reasonable expectation Defendant would not track and record their location and movement for use in a massive surveillance apparatus

like the one created by Flock and perpetuated by Defendant's participation.

80. Privacy polls consistently show that Americans overwhelmingly consider their location information to be among the most sensitive facets of their life.

81. For example, one poll found that 78-percent of Americans believe that Congress should "strengthen privacy protections for people in the U.S. against warrantless government surveillance of their…location information" (as opposed to 9-percent against).[37] Likewise, in another survey, 88-percent of Americans stated that "not having someone watch you or listen to you without your permission" was important to them, with 72-percent rating it as "very important."[38]

82. Personal privacy and informed consent are material to Plaintiffs and Class Members, as also demonstrated by the California Legislature's requirement in the ALPR Law that any end-user of an ALPR camera or system provide public notice of the same.

## VII. DEFENDANT VIOLATED CONSUMER PRIVACY UNDER CALIFORNIA LAW AND FAILED TO ADHERE TO CALIFORNIA'S ALPR LAW

83. The ALPR Law, codified at Cal. Civ. Code §§ 1798.90.51(a) and 1798.90.53(a), requires Defendant, as an operator and end-user, to, among other things, "[m]aintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure." *Id.*

84. These reasonable security procedures and practices required Defendant to implement an ALPR usage and privacy policy, "in order to ensure that the access, use, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties." Cal. Civ. Code §§ 1798.90.51(b); 1798.90.53(b).

---

[37] *YouGov Mass Surveillance Debate Polling*, DEMAND PROGRESS EDUCATION FUND (Dec. 14, 2023), https://demandprogresseducationfund.org/new-polling-as-mass-surveillance-debate-reaches-final-stages-in-congress-americans-demonstrate-overwhelming-support-for-increased-privacy-protections/ (last accessed Aug. 20, 2025).

[38] Mary Madden and Lee Rainie, Americans' Attitudes About Privacy, Security and Surveillance, PEW RESEARCH CENTER (May 20, 2015), https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/ (last accessed Aug. 20, 2025).

85. Moreover, as specifically set forth, supra, Cal. Civ. Code § 1798.90.53's ALPR usage requirements command that ALPR operators and end-users, such as Defendants, "at minimum," must implement and publicly post a privacy policy with regards to their ALPR use that informs the public with regard to Defendant's purposes for accessing and using ALPR information, list the job title and training for individuals who will have access to the ALPR information, inform individuals how long their ALPR information will be retained, and also describe how the ALPR system will be monitored for compliance with all applicable privacy laws, among other things. *See* Cal. Civ. Code §§ 1798.90.51(b)(2)(A)-(G); 1798.90.53(b)(2)(A)-(G).

86. Under Cal. Civ. Code § 1798.90.51(b)(1), if an ALPR operator or end-user "has an Internet Web site, the usage and privacy policy shall be posted conspicuously on that Internet Web site."

87. In establishing these specific requirements governing operators and end-users with regard to their ALPR use, the Legislature expressly provided that such requirements enumerated in Cal. Civ. Code §§ 1798.90.51(b)(2)(A)-(G) and 1798.90.53(b)(2)(A)-(G) constitute the **"*minimum*"** safeguards necessary to protect individuals' privacy and civil liberties. Accordingly, any failure to comply with or meet these minimum statutory requirements is a violation of the ALPR Law. Cal. Civ. Code §§ 1798.90.51(b)(2)(A)-(G); 1798.90.53(b)(2)(A)-(G).

88. Upon information and belief, Defendant failed to meet the requirements of the ALPR Law by failing to maintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure.

89. Accordingly, upon information and belief, Defendant failed to ensure that the access, use, sharing, and dissemination of Plaintiffs' and Class Members' ALPR information was consistent with respect for individuals' privacy and civil liberties. Cal. Civ. Code § 1798.90.51(b); Cal. Civ. Code § 1798.90.53(b).

90. Furthermore, Defendant failed to implement, post, or adhere to the ALPR Law's usage requirements, in that Defendant failed to implement or conspicuously post an ALPR privacy policy

on the Ulta website compliant with California law from the time the cameras were installed until at least July 2, 2026. Upon information and belief, from the time the ALPR systema were installed until at least July 2, 2026, Defendant did not publicly post a conspicuous ALPR privacy policy on that website.

91. Defendant's failure to post any ALPR-specific policy from the time the ALPR system was installed until the present, violates Cal. Civ. Code §§ 1798.90.51(b)(1) and 1798.90.53(b)(1), which require every ALPR operator and end-user to "implement a usage and privacy policy" and to post that policy "conspicuously" on its website. Defendant failed to do so. Therefore, Defendant also failed to satisfy every one of the seven mandatory elements required by Cal. Civ. Code § 1798.90.51(b)(2)(A)–(G).

92. These reasonable security procedures and practices required Defendant to implement an ALPR usage and privacy policy, "in order to ensure that the access, use, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties." Cal. Civ. Code § 1798.90.53(b).

93. Moreover, as specifically set forth, *supra*, Cal. Civ. Code § 1798.90.53's ALPR usage requirements command that ALPR end-users, such as Defendant, "at minimum," must implement and publicly post a privacy policy with regards to its ALPR use that informs the public with regard to Defendant's purposes for accessing and using ALPR information, list the job title and training for individuals who will have access to the ALPR information, inform individuals how long their ALPR information will be retained, and also describe how the ALPR system will be monitored for compliance with all applicable privacy laws, among other things. *See* Cal. Civ. Code § 1798.90.53(b)(2)(A)-(G).

94. Defendant failed to meet the requirements of the ALPR Law by failing to maintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure.

95. Furthermore, Defendant failed to implement, post, or adhere to the ALPR Law's usage requirements, in that Defendant failed to implement or post an ALPR privacy policy compliant with California law.

96. Accordingly, Defendant failed to ensure that the access, use, sharing, and dissemination of Plaintiffs' and Class Members' ALPR information was consistent with respect for individuals' privacy and civil liberties. Cal. Civ. Code § 1798.90.53(b).

## TOLLING AND ESTOPPEL

97. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its use of Flock ALPRs, and the scope of information that they collected about Plaintiffs and Class Members.

98. As described above, the Flock ALPRs are inconspicuous. A reasonable person without prior knowledge of Flock's products would not understand the function or scope of information collected by an ALPR. At most, the ALPRs look like standard security cameras; nothing about the ALPR's inconspicuous appearance announces that they are capturing license plate information and combining it with data collected by at least 80,000 other similar units being used to track vehicle and individual location data.

99. Defendant was under a statutory duty to disclose the nature, significance, and consequences of its use of the Flock ALPRs. Despite this obligation, Defendant failed to make publicly available notice of its use of ALPR systems on its properties, and additionally, failed to post on its website notice of usage and privacy practices with regard to the ALPRs present on its properties that would have informed Plaintiffs and Class Members that they were being tracked by Flock's surveillance network. By failing to adhere to the duty of disclosure required by the ALPR Law, Defendant concealed its surveillance and Plaintiffs had no way to know that Defendant was aggregating information about them with information from tens of thousands of other cameras.

100. Therefore, through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's unlawful conduct. As such, Plaintiffs could not have known the information essential to pursue their claims.

101. For these reasons, all applicable statutes of limitation have been tolled pursuant to the discovery rule.

102. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's misconduct would have been shortly before the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

103. Plaintiffs bring this class action on behalf of themselves and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seek certification of the following class (hereinafter referred to as "the Class"):

> All California citizens whose Vehicle Tracking Data was captured by Ulta's ALPR cameras at any Ulta store located in California during the applicable statute-of-limitations period through the date of class certification (the "Class").

Excluded from the Class is Defendant and its respective officers, directors, employees, agents, affiliates, and subsidiaries; any judicial officer presiding over this matter and their immediate families and judicial staff; and any persons who timely opt out of the Class.

104. **Numerosity.** The class is so numerous that individual joinder is impractical. Ulta operates 185 California stores drawing millions of shopper visits annually. Based on documented traffic volumes at major retail stores, the class is estimated to include millions of individuals. The precise number will be ascertainable through discovery, including Defendant's and its vendor's ALPR information database records.

105. **Ascertainability.** ALPR systems operating at Ulta's California stores maintain logs of every license plate scanned, including timestamps and locations. EFF's analysis of Flock audit records demonstrated that Flock's records identify the date, time, user, network, reason, and license plate for each search. These logs identify, at minimum, the license plate number associated with each class member's vehicle during each visit.

106. **Commonality and Predominance.** Common questions of law and fact exist as to all class members and predominate over any individual issues, including:

A. Whether Ulta qualifies as an "ALPR operator" and/or "ALPR end-user" under Cal. Civ. Code § 1798.90.5;

B. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Vehicle Tracking Data, including their location, license plate, and vehicle information, would be disclosed to third parties;

C. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Vehicle Tracking Data, including their location, license plate, and vehicle information, was being disclosed without their consent;

D. Whether Defendant's ALPR policy fails to include every mandatory element required by §§ 1798.90.51(b)(2) and 1798.90.53(b);

E. Whether a non-compliant ALPR policy, one that is published but omits mandatory elements, causes "harm" within the meaning of § 1798.90.54, as the *Bartholomew* February 27, 2026, modification order expressly left unresolved;

F. Whether Defendant failed to maintain required security procedures and audit records;

G. Whether Defendant shared or permitted the sharing of California ALPR information with law enforcement agencies in a manner not authorized by a fully compliant ALPR policy;

H. Whether Defendant's conduct was knowing, willful, and/or reckless; and

I. Whether Plaintiffs and the Class are entitled to statutory and punitive damages and injunctive relief.

107. **Typicality.** Plaintiffs' claims are typical of those of the proposed class. All class members were subjected to Defendant's uniform ALPR surveillance practices and Defendant's uniform ALPR policy deficiencies across its California stores. All class members were harmed in the same manner and are entitled to the same statutory remedies.

108. **Adequacy.** Plaintiffs are adequate representatives of the class, their interests do not conflict with those of the class, they have retained counsel competent and experienced in ALPR and consumer class action litigation, and they intend to prosecute this action vigorously.

109. **Superiority.** A class action is superior to other available means for adjudicating this controversy. Individual class members lack the resources to individually pursue these claims; individualized litigation would create inconsistent judgments; and the common factual and legal questions are best resolved in a single proceeding. The $2,500 per-person statutory damages are significant in aggregate but modest individually, making class treatment essential.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF CALIFORNIA'S ALPR LAW
### Cal. Civ. Code § 1798.90.5, *et seq.*
### *(On Behalf of Plaintiffs and the Class)*

110. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

111. The California ALPR Privacy Act, Cal. Civ. Code §§ 1798.90.5, *et seq*., regulates the collection, use, maintenance, sharing, and dissemination of ALPR information by both "ALPR operators," defined as "a person that operates an ALPR system," and "ALPR end-users," defined as "a person that accesses or uses an ALPR system." Cal. Civ. Code § 1798.90.5(a), (c).

112. Because Defendant operates and controls the physical properties at which Flock ALPR cameras are deployed, and because Defendant installed, operated, accessed, and used Flock's ALPR systems throughout the California, Defendant is subject to the ALPR Law as both an ALPR operator and ALPR end-user. Cal. Civ. Code § 1798.90.5(a), (c).

113. Defendant violated the ALPR Law. First, Defendant did not implement a usage and privacy policy regarding its use of ALPR information or make it publicly available, including on its website, let alone a policy that satisfied the requirements of the ALPR Law.[39]

114. This failure of Defendant to draft a privacy policy relating to the ALPR data, post the privacy policy on its website, and adhere to the privacy policy for the benefit of Plaintiffs and Class

[39] Cal. Civ. Code § 1798.90.51(b)(2), 53(b)(2) (listing required information to be included in ALPR usage and privacy policy).

Members, is inconsistent with Plaintiffs' and Class Members' individual privacy and civil liberties in that it deprived them of their statutory right to know.

115. The ALPR Law has been in effect for over ten years and was passed long before Defendant implemented its use of ALPRs. As such, Defendant either knew or should have known about the Law's privacy policy requirements (either through its own research or from Flock), yet Defendant failed to implement and publicly post the required policy. Therefore, Defendant acted either willfully or recklessly in disregard of the ALPR Law.

116. As a result of Defendant's violation of the ALPR law, and pursuant to Cal. Civ. Code § 1798.90.54, Plaintiffs and each Class Member are entitled to (i) the greater of their actual damages or statutory liquidated damages of $2,500; (ii) punitive damages; (iii) reasonable attorneys' fees and other litigation costs; and (iv) other preliminary and equitable relief as the Court determines to be appropriate.[40]

## COUNT II
## INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION
## Cal. Const. Art. 1, § 1
***(On Behalf of Plaintiffs and the Class)***

117. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

118. Article I, section 1 of the California Constitution provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and ***privacy***."

119. The right to privacy in California's constitution creates a private right of action against private and government entities.

120. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy, and

[40] Cal. Civ. Code § 1798.90.54(b).

(3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

121. Defendant violated Plaintiffs' and Class Members' constitutional right to privacy by recording, collecting, storing, aggregating, and disseminating Plaintiffs' and Class Members' Vehicle Tracking Data.

122. Defendant's unlawful conduct knowingly facilitated the recording, tracking, monitoring, and aggregation of Plaintiffs' and Class Members' vehicle's movements through areas monitored, captured, collected, and/or aggregated by ALPRs and related systems.

123. Defendant's use and installation of Flock ALPRs at its locations facilitated the aggregation and long-term tracking of Plaintiffs' and Class Members' individual movements, as Defendant's use of Flock's pervasive network of tens of thousands of ALPRs and aggregation of data across Flock's network created comprehensive movement profiles of Plaintiffs and Class Members.

124. Plaintiffs and Class Members have a legally protected privacy interest in their Vehicle Tracking Data when that information is aggregated and used to track their movements, for which they had a reasonable expectation of privacy, which Defendant violated when it surreptitiously recorded and provided to Flock for upload to the Flock Safety Network knowing that it would be aggregated, analyzed, tracked, and combined with other records Flock maintains regarding Plaintiffs and the Class Members.

125. Accordingly, Defendant's actions were performed in a manner that was highly offensive to Plaintiffs and Class Members and were an egregious violation of social norms.

126. Defendant has intruded upon Plaintiffs' and Class Members' legally protected privacy interests, including interests in precluding the aggregation, analyzation, tracking, and dissemination or misuse of their personal movements and private affairs, through Defendant's monitoring, capturing, collecting, and aggregating Plaintiffs' and Class Members' Vehicle Tracking Data.

127. Plaintiffs and Class Members had a reasonable expectation of privacy in their Vehicle Tracking Data. Plaintiffs and Class Members did not consent to or otherwise authorize Defendant to capture, collect, monitor, aggregate, or disclose their Vehicle Tracking Data.

128. Defendant invaded Plaintiffs' and Class Members' privacy by capturing, collecting, monitoring, aggregating, and disclosing, without prior statutorily required notice and without authorization, Plaintiffs' and Class Members' Vehicle Tracking Data to Flock. Specifically, Defendant's use and installation of Flock ALPRs at on its properties allowed for the long-term tracking of Plaintiffs' and Class Members' individual movements on its properties through Defendant's integration with Flock's pervasive Flock Safety Network, which is made up of data tracked and aggregated by tens of thousands of other Flock ALPRs to create comprehensive movement profiles of individuals, including Plaintiffs and Class Members.

129. Plaintiffs and Class Members did not reasonably expect Defendant would commit such acts in violation of their privacy.

130. As a direct and proximate result of Defendant's invasion of their privacy, Plaintiffs and Class Members have been damaged and have suffered actual and concrete injuries, including the diminution of value of their private information, the loss of valuable privacy rights and protections, heightened stress, fear, anxiety, risk of future invasions of privacy and the mental and emotional distress and harm to human dignity interests.

131. Plaintiffs and Class Members are entitled to appropriate relief, including damages to compensate them for such harms, and hereby seek appropriate relief including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the aforementioned harms to their privacy interests, as well as nominal damages and/or disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

132. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT III**
**COMMON LAW INVASION OF PRIVACY**
***(On Behalf of Plaintiffs and the Class)***

133. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

134. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their confidential information, including their Vehicle Tracking Data; and (2) making personal travel decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to travel and associate lawfully with others without being subjected to surveillance absent Plaintiffs' and Class Members' knowledge or consent.

135. Defendant's disclosure of Plaintiffs' and Class Member's Vehicle Tracking Data, without the knowledge and informed consent of Plaintiffs and Class Members and in violation of the ALPR Law is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

136. Plaintiffs and Class Members had a reasonable expectation of privacy in their personal and private affairs and movements, which includes the expectation that their Vehicle Tracking Data would be protected from surreptitious disclosure to third parties and the aggregation of data which would allow third parties to track their movements.

137. Defendant's repeated acquisition, disclosure, and aggregation of Plaintiffs' and Class Members' Vehicle Tracking Data, and its inclusion in a large surveillance database that permits near constant tracking of a person's movements, is highly offensive to the reasonable person.

138. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

139. As a direct and proximate result of Defendant's invasion of their privacy, Plaintiffs and Class Members have been damaged and have suffered actual and concrete injuries, including the diminution of value of their private information, the loss of valuable privacy rights and protections, heightened stress, fear, anxiety, risk of future invasions of privacy and the mental and emotional distress and harm to human dignity interests.

140. Plaintiffs and Class Members are entitled to appropriate relief, including damages to compensate them for such harms, and hereby seek appropriate relief including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the aforementioned harms to their privacy interests, as well as nominal damages and/or disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

141. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

142. Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT IV**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs and the Class)***

143. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

144. Defendant acquired Plaintiffs' and Class Members' inherently valuable Vehicle Tracking Data, through inequitable means, including through the surreptitious use of Flock ALPR systems, in that it failed to publicly disclose such use in violation of the ALPR Law, as previously alleged.

145. Thus, Plaintiffs and Class Members unknowingly provided their inherently valuable Vehicle Tracking Data to Defendant, which then enriched itself as users of Flock ALPRs receive access to inherently valuable information from other Flock customers' ALPRs in exchange for sharing their own information to the Flock Safety Network.

146. Upon information and belief, Defendant made a conscious, self-interested choice to participate in Flock's mass surveillance apparatus in exchange for benefiting from information collected by other members of that apparatus.

147. By installing Flock ALPRs on its properties and sharing the information captured by those ALPRs with Flock, Defendant chose to provide a record of each and every driver that traveled

within the vicinity of the ALPRs for use in Flock's mass surveillance enterprise in exchange for valuable data collected by ALPRs on other Flock customers' properties.

148. Defendant was enriched in the form of being granted access to the Flock Safety Network database in exchange for allowing Flock to access the records created by the ALPRs installed on its own properties.

149. Indeed, Defendant calculated to avoid its privacy obligations at the expense of Plaintiffs and Class Members who, as a result, suffered as a direct and proximate result of Defendant's misconduct.

150. If Plaintiffs and Class Members had known that Defendant was utilizing Flock ALPRs and sharing the inherently valuable Vehicle Tracking Data with third parties, they would not have frequented Defendant's shopping center and Defendant would not have been able to acquire their inherently valuable Vehicle Tracking Data.

151. Under the principles of equity and good conscience, Defendant should not be permitted to retain the benefits it gained at the expense of Plaintiffs and Class Members. As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

152. Plaintiffs and Class Members are entitled to appropriate relief, including damages to compensate them for such harms, and hereby seek appropriate relief including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the aforementioned harms to their privacy interests, as well as nominal damages and/or disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

153. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members, respectfully request that the Court:

a. Certify this action as a class action on behalf of the proposed Class, appointment of Plaintiffs as Class Representatives, and appoint Plaintiffs' Counsel as Class Counsel;

b. Declare that Defendant has violated California's ALPR Privacy Act, Cal. Civ. Code §§ 1798.90.5 *et seq* and the California Constitution, Article I, § 1;

c. Award actual damages, or not less than statutory liquidated damages of $2,500 per person per violation, pursuant to Cal. Civ. Code § 1798.90.54(b)(1);

d. Award punitive damages pursuant to Cal. Civ. Code § 1798.90.54(b)(2) and applicable common law based on Defendant's knowing, willful, and reckless disregard of California law and Plaintiffs' and Class Members' privacy rights;

e. Enter a permanent injunction requiring Defendant to:

i. Immediately cease sharing California ALPR information with any law enforcement agency not authorized by a fully compliant ALPR usage and privacy policy that satisfies all elements of Cal. Civ. Code §§ 1798.90.51(b)(2) and 1798.90.53(b), including restrictions on out-of-state and federal agency access;

ii. Implement and conspicuously post a fully compliant ALPR-specific usage and privacy policy—including a named custodian title, defined data retention period, specific training requirements, an adequate monitoring description, and meaningful law enforcement sharing restrictions—at each California store location and on Defendant's website;

iii. Delete all California ALPR information collected during the period of non-compliance, except as required by law;

iv. Terminate or modify any ALPR vendor relationship that does not permit Defendant to independently maintain and verify access controls, audit records,

and restrictions on federal and out-of-state data sharing consistent with California law;

v. Submit to independent audit of its ALPR information procurement practices and vendor compliance for a period of not less than three (3) years following entry of judgment; and

vi. Post conspicuous notice at all California store parking lot entrances informing visitors that ALPR cameras are in use, the identity of the ALPR operator, and the URL of a compliant usage and privacy policy;

f. Award restitution and disgorgement of any unjust enrichment Defendant derived from its unlawful ALPR practices;

g. Award prejudgment interest on all amounts awarded;

h. Award Plaintiffs and the class their reasonable attorneys' fees and litigation costs under applicable law, as well as pursuant to Cal. Civ. Code § 1798.90.54(b)(3); and

i. Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

Dated: September 9, 2026

Respectfully Submitted,

By: _/s/ Michael Connett_
Michael Connett (SBN 300314)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone 888-747-4529
*mconnett@sirillp.com*

Tyler J. Bean (*pro hac vice* to be filed)
Albert J. Asciutto (*pro hac vice* to be filed)
Alexander J. Garcia (*pro hac vice* to be filed)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone 212-532-1091
Facsimile 646-417-5967
*tbean@sirillp.com*
*aasciutto@sirillp.com*
*agarcia@sirillp.com*

*Attorneys for Plaintiff and the Proposed Class*